UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                  Crim. No.3:03cr78(SRU)

v.

KENNETH MOORE                             July 12, 2005

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

_____ On June 17, 2005, the United States Court of Appeals for the Second Circuit granted the defendant's motion, which had been made with the Government's consent, to remand the case to the district court "to determine whether to resentence" the defendant in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals's decision in United States v. Crosby, No. 03-1675, 2005 WL 240916 (2d Cir. Feb. 2, 2005). On June 28, 2005, in light of the remand order, the Government filed a motion with the Court seeking, inter alia, an order requesting the filing of sentencing memoranda to address whether a nontrivially different sentence should be imposed in the wake of Booker and Crosby. On June 30, 2005, the Court issued such an order and asked the parties to file sentencing memoranda on or before July 29, 2005. This memorandum is filed in response to that order. As discussed more fully below, because a nontrivially different sentence should not be imposed in this case, re-sentencing is not appropriate.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

On March 20, 2003, a federal grand jury sitting in Hartford returned a three count indictment against the defendant charging him with identification fraud, in violation of 18 U.S.C. § 1028(a)(7), and access device fraud, in violation of 18 U.S.C. § 1029(a)(2). The defendant was presented and arraigned on March 26, 2003 before the Honorable William I. Garfinkel and released on a $100,000

1

non-surety bond which was co-signed by his sister Mattie Hamber. The first condition of his release was that the defendant "not commit any offense in violation of federal, state or local law while on release . . . ."

After filing several motions to continue jury selection, the defendant decided to change his plea to guilty and enter into a written plea agreement with the Government. On February 27, 2004, the defendant appeared before this Court and changed his plea to guilty as to Count One of the Indictment. The Court granted the defendant's request to remain released on bond pending sentencing and agreed to order the same conditions that had previously been ordered by Judge Garfinkel.

In the plea agreement, the parties entered into a lengthy "Stipulation of Offense Conduct." In short, the defendant admitted that, from in or about June, 2001 through and including November, 2001, he used the name, social security number and other identifying information of another person, i.e., Bobby Wade, to obtain multiple credit cards and consumer loans. He admitted that, in 2000, he installed a security system in the home of Bobby Wade; he owned his own security company and was an independent contractor for a national security company called Protection One. When the defendant installed Bobby Wade's security system, he learned Mr. Wade's personal information, including his name, address, date of birth and social security number. Among other things, the defendant admitted to purchasing in Bobby Wade's name a $40,000 fishing boat, a $35,000 Mercedes Benz and two Chevrolet S-10 for over $15,000. He also admitted to receiving credit cards in Bobby Wade's name from US Bank, First National Bank of Omaha, Shell Oil, Lowe's, and Macy's. The Government calculated the total loss amount as a result of the defendant's relevant conduct to be $209,669.25.

The parties also entered into a Guideline Stipulation.  They agreed that the loss amount in

the case did not exceed the range of $200,000 to $400,000.[1]  The defendant reserved his right to

argue that the loss amount was under $200,000.  They also agreed that to a two level enhancement

because the offense involved more than 10, but less than 50, victims and to a two level enhancement

because the offense involved identification fraud.  <u>See</u> U.S.S.G. §§ 2B1.1(b)(2)(A)(i) and

2B1.1(b)(9).  Finally, the parties agreed that three levels would be subtracted under U.S.S.G. § 3E1.1

for acceptance of responsibility.  The Government expressly stated that it would not make this

recommendation if "the defendant engages in any acts which . . . constitute a violation of any

condition of release."  The defendant agreed that he would not seek additional adjustments to the

offense level, and the Government expressly reserved the right to argue for adjustments under

U.S.S.G. §§ 3A1.1 (Vulnerable Victim) and 3B1.3 (Abuse of Position of Trust or Use of Special

Skill).  Both parties expressly reserved their right to argue for upward and downward departures

from the stipulated range.

The Pre-Sentence Report ("PSR") agreed with the Guideline Stipulation entered into by the

parties in that it placed the defendant in Criminal History Category III and at an adjusted offense

level of 19, which accounted for a loss amount of between $200,000 and $400,000, a two level

---

[1]The Government calculated actual losses as a result of the defendant's relevant conduct to be $209,669.25, which was detailed in the Stipulation of Offense Conduct attached to the plea agreement and an additional exhibit attached to the Government's Sentencing Memorandum. That amount reflected the fact that the creditors for the Trophy fishing boat, the two Chevrolet S-10 pickup trucks and the Mercedes Benz recouped some of their losses by repossessing and selling the items purchased by the defendant.  It bears note, however, that the commentary to U.S.S.G. § 2B1.1 recommends that the loss amount be considered as "the greater of actual loss or intended loss."  <u>Id.</u> comment. (n.3(A)).  In this case, the intended loss for the repossessed items would be their original purchase prices: $41,420.44 for the fishing boat, $15,522.43 for the two pickup trucks and $35,189.04 for the Mercedes.  <u>See</u> U.S.S.G. § 2B1.1 comment. (n.3(a)(ii)). With those figures, the loss amount would increase to $229,336.45.

increase for between 10 and 50 victims, a two level increase for identification fraud and a three level reduction for acceptance of responsibility. See PSR ¶ 66. The resulting guideline range was 37-46 months' incarceration. See PSR ¶¶ 26-28, 33, 34.

At sentencing, the Government argued that the defendant's admitted violation of the conditions of his pre-trial release order disqualified him for any reduction for acceptance of responsibility. Specifically, the defendant has admitted that, while employed as a loan officer for L&S Mortgage Company ("L&S"), he stole funds from an escrow account that were supposed to be used to pay creditors of the customer involved in the transaction. In addition, the PSR also noted that L&S had contacted the Probation Office and alleged that the defendant had stolen money from at least twenty clients, many of whom had contacted L&S and complained that the defendant had charged them exorbitant application fees in cash (as high as $950) to "expedite" their mortgage application process. After hearing extensive argument on the issue, the Court ultimately determined that the defendant had accepted responsibility for this offense and credited the defendant three levels for acceptance of responsibility.

The Government also argued that (1) the defendant's conduct in stealing the identity of Bobby Wade in the course of installing a security system in his home constituted an abuse of a position of trust, as contemplated by U.S.S.G. § 3B1.3, and (2) a horizontal, upward departure was warranted because the defendant's criminal history did not reflect the seriousness of his past criminal conduct or the likelihood that he would offend again. The defendant opposed these arguments and maintained that (1) the actual loss amount was below $200,000, (2) the defendant's criminal history category was II, not III, because he should not have received points for a failure to appear conviction, and (3) a downward departure was appropriate for a variety of reasons.

4

The Court rejected the Government's arguments as to the defendant's abuse of a position of trust and defendant's various arguments in support of a downward departure. As to loss amount, the Court made a factual finding, based on various exhibits submitted by the Government, that the actual loss amount exceeded $200,000. As to criminal history, the Court was persuaded by the defendant's argument that the PSR improperly attributed one criminal history point for a 1997 failure to appear conviction, which shared the same docket number as a contemporaneous fourth degree larceny conviction. Without this conviction, the defendant fell into Criminal History Category II. The Court then granted the Government's motion for a horizontal upward departure, found that Criminal History Category II "significantly understates the likelihood of recidivism," and moved the defendant back into Criminal History Category III. Specifically, the Court stated:

> Here, we have a very long history of theft related crimes starting at age 28, some 18 years ago, and continuing over and over with multiple, multiple larcenies, multiple theft-type crimes, including use of motor vehicle, issuing bad check and so forth. And what we have today is really a continuation of that long string of conduct, and I frankly have little faith that a sentence imposed in this case will deter Mr. Moore from continuing that conduct in the future. I think that there is an, unfortunately, a significant chance that he will repeat this type of conduct after he's released from prison and certainly believe that a category two score significantly under states the risk of recidivism.

Tr.5/17/04 at 97-98. Although the Court recognized that it was a "close call" and that the Government had made a "strong argument" in favor of moving the defendant to Criminal History Category IV, the Court stopped at Criminal History Category III.

It bears note that, in arguing that the defendant's failure to appear conviction should have been merged with his fourth degree larceny conviction, which argument was raised in a memorandum filed just before the start of the sentencing hearing, the defendant failed to cite the Court to relevant Second Circuit precedent which directly conflicted with his argument and supported the PSR's calculation. In United States v. Boonphakdee, 40 F.3d 538, 543-44 (2d. Cir.

5

1994), the Second Circuit relied on the plain language of the commentary to U.S.S.G. § 4A1.2(a)(2): "Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)." U.S.S.G. § 4A1.2, comment. (n. 3). The plain language of Application Note 3 emphasizes that "the intervening arrest" refers to the arrest for the <u>first</u> offense. <u>See</u> <u>id.</u>; U.S.S.G. § 4A1.2, comment. (n. 3). In the defendant's case, his arrest for the fourth degree larceny charge constituted the "intervening arrest" for the first offense and separated the defendant's actual commission of the larceny from his actual commision of the failure to appear. Therefore, the PSR correctly attributed one point for the failure to appear conviction, regardless of the fact that the conviction shared the same docket number as the fourth degree larceny conviction. <u>See, e.g.</u>, <u>Boonphakdee</u>, 40 F.3d at 544 (finding that drug trafficking offense and manslaughter offense, committed while on pretrial release for drug trafficking offense, were not related because they were separated by intervening arrest for drug trafficking offense); <u>United States v. Bradley</u>, 218 F.3d 670, 673 (7th Cir. 2000) (finding offenses to be unrelated because defendant arrested for acts constituting first offense prior to engaging in acts constituting second offense); <u>United States v. Edmonds</u>, 1998 WL 276295, at **5 (4th Cir. May 29, 1998) (unpublished opinion) (finding that defendant's May 9, 1988 arrest for shooting, which came prior to his October, 1998 commission of robbery, prevented shooting and robbery cases from being considered as related cases under § 4A1.2); <u>United States v. Dukes</u>, 1995 WL 358468, at **1 (6th Cir. June 14, 1995) (unpublished opinion) (finding offenses to be unrelated because second offense committed over nine months after intervening arrest for first offense); <u>United States v. Andreu</u>, 1998 WL 289701, at *2 (S.D.N.Y. June 4, 1998) (finding drug cases unrelated because defendant arrested for first drug offense prior to commission of second drug

6

offense).[2]

Faced with a guideline range of 37-46 months, the Court imposed a 43 month sentence, three years of supervised release, no fine and a $100 special assessment. The Court noted that the defendant had engaged in a serious crime which "deserves significant punishment." Tr.5/17/04 at 99. The Court explained, "[Y]ou need to be removed from society for a period of time, both to protect society and to give you a chance to come to grips with the rest of your life, and I hope that this sentence will deter you and deters other people from doing what it is that you've done."

On June 17, 2005, the Second Circuit vacated the defendant's sentence and remanded the case back to this Court for re-sentencing in light of Crosby and Booker. This Court then requested briefing on the threshold question of whether a nontrivially different sentence should have been imposed had the Court understood sentencing law as subsequently explained by the Supreme Court in Booker.

## II.    DISCUSSION

### A.    Sentencing in the Wake of Booker

In United States v. Booker, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the

---

[2]Given the fact that the defendant did not raise this issue until the sentencing hearing, the Government did not have the opportunity to do any research; however, when the exact same issue was raised in a timely fashion in a subsequent, unrelated prosecution (United States v. Tucker, 3:03cr133 (CFD)), different counsel from the Federal Public Defender's Office conceded that, under Boonphakdee, a failure to appear conviction which follows an arrest for a separate conviction, should be counted separately under § 4A1.2.

Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. at *24.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of Booker. In United States v. Crosby, No. 03-1675, 2005 WL 240916 (2d Cir. Feb. 2, 2005), the Court summarized the impact of Booker as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Slip op. at 24-25 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before Booker/Fanfan." Id. at 20; see id. at 19. In limited circumstances, "precise

calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Id. at 21.  Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure."  Id.  In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One.  These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear

that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in <u>Booker</u>, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Id.</u>, 2005 WL 50108 at *27. As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." <u>Crosby</u>, slip op. at 18.

> [I]t is important to bear in mind that <u>Booker/Fanfan</u> and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after <u>Booker/Fanfan</u>, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

<u>Id.</u> at 25.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in <u>Booker</u> recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. <u>See, e.g.</u>, <u>Booker</u>, 2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial

10

efforts to determine, and to base punishment upon, the <u>real conduct</u> that underlies the crime of conviction."); <u>id.</u> at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); <u>id.</u> at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  <u>See also</u> <u>United States v. Wanning</u>, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a).

### B.    The Court's 43 Month Sentence Resulted From A Guideline Range Which Accounted For The Factors Set Forth in § 3553(a)

As discussed above and as is more fully evidenced by the transcript of the lengthy sentencing hearing in this case, the Court's determination of the Sentencing Guideline range and the ultimate sentence in this case, which fell toward the high-end of that range, was the result of thoughtful and extensive consideration of both the parties arguments regarding the appropriate adjusted offense level and criminal history category, and the various sentencing factors set forth in § 3553(a).  With respect to the guidelines calculation, the Court exhaustively considered the parties' arguments as to the loss amount, the acceptance of responsibility reduction, the abuse of a position of trust enhancement, the appropriate criminal history category, and, finally, a variety of downward departure grounds.  With respect to § 3553(a), the Court imposed a sentence near the top of the guideline range to emphasize specific and general deterrence, to reflect the seriousness of the offense and to protect

11

society from the type of economic crime committed by the defendant. Still, the Court explained that it had taken into account, to some degree, the goal of rehabilitating the defendant so that he would be encouraged not to repeat the same criminal conduct in the future, as he had done so many times in the past.

To the Government's knowledge, there are no factors which would suggest that some lesser sentence would have been appropriate, and, therefore, a guidelines sentence is reasonable in this case. Accordingly, because a nontrivially different sentence should be not imposed, the Court should decline to re-sentence the defendant in this matter.

## III.    CONCLUSION

The Court imposed a sentence of 43 months' incarceration, which was near the top of the 37-46 month guideline range. The critical inquiry at this junction is whether the Court would have imposed a nontrivially different sentence than the 43 months had it known that the sentencing guidelines were advisory, not mandatory. Based on the argument set forth above, the Court should re-affirm its prior sentence and decline to re-sentence the defendant.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


ROBERT M. SPECTOR
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT18082
450 MAIN STREET
HARTFORD, CT 06103
860-947-1101

### C E R T I F I C A T I O N

       This is to certify that on July 12, 2005 a true and correct copy of the foregoing was sent via regular mail to

Ms. Deirdre Murray
Assistant Federal Public Defender
Officer of the Federal Public Defender
2 Whitney Avenue
New Haven, Connecticut 06510

United States Probation Officer Christopher Rogers
United States Probation Office
157 Church Street, 22nd Floor
New Haven, Connecticut 06510

                                   ROBERT M. SPECTOR
                                   ASSISTANT U.S. ATTORNEY